Tower Underwriters, Inc. v. Culley.

Division B. May 28, 1951.

No. 37995 (53 So. (2d) 94)

Wynn, Hafter, Lake & Tindall, L. Barrett Jones, Joseph W. Lloyd, for appellant.

Ernest Kellner, for appellee.

**Hall, J.**

Appellee brought this suit in chancery seeking an accounting from appellant and seeking to be declared the owner of the business operated in the City of Greenville under the name of Tower Loan Brokers and also seeking possession of said business. This appeal is from a decree granting the relief sought and awarding appellee a money judgment against appellant in the amount of $4,698.73 with interest at the rate of 6% per annum from March 15, 1950.

Appellant is engaged in the loan brokerage business with numerous offices in Mississippi which are operated under the name of Tower Loan Brokers. Some of these offices are owned by appellant and some have been by it sold to individuals under a franchise contract whereby the individual is authorized to continue operations under the same name, in the manner prescribed by the franchise, receiving a percentage of the brokerage fees, and being a general guarantor on all loans made by him. Appellee was operating one of these offices for appellant and on November 23, 1945, appellant entered into one of these franchise contracts with appellee whereby appellant sold its loan office at Greenville to appellee, and gave him the right to continue the use of the name of Tower Loan Brokers and obligated him to "broker" all loans through appellant. The consideration for this sale was $5,942.40 of which $1,742.40 was then paid in cash and the balance of $4,200 was to be liquidated at the rate of $100 per month beginning January 1, 1946.

Paragraphs VI and VII of the contract are as follows:

"VI. Party of the second part reserves the right to cancel this contract if party of the first part fails to live up to its provisions, and likewise party of the first part may cancel the contract and reclaim the ownership of the franchise if party of the second part fails to live up to the conditions of this contract. Notice of cancellation by either party must be in writing and will not be effective until the expiration of ninety days from its date.

"VII. Party of the second part agrees that if party of the first part cancels this contract for any breach thereof by party of the second part all payments made by party of the second part are to be held until the loss liability, if any, of party of the second part can be determined, but said funds in any event shall be held for a period of not less than one year. Upon ascertainment of the loss liability of party of the second part, party of the first part agrees to return to party of the second part any portion of the original cash payment made under this contract for the franchise not needed to pay off losses."

On July 31, 1947, appellant's president, Wyatt Robinson, made an audit of appellee's office and found that collections by him in the amount of $2,321.67 had not been remitted to Louisiana Discount Corporation which was the lending agency actually making the loans and to which both appellant and appellee were liable as guarantors. Thereupon it was agreed between Culley and Robinson that appellant would immediately take over the operation of the franchise and business and that all brokerage fees, above actual expense, would be used toward paying losses and shortages until fully covered and that the payment of all sums due or to become due to appellant would be deferred until the Louisiana Discount Corporation was paid off in full, and Robinson

gave Cully a written memorandum or letter to that effect, dated July 31, 1947.

Appellant accordingly took over the business and placed J. M. Menger in charge of its operation. For the period from August 1 through December 31, 1947, the appellant's books showed a net profit of $1,122.69 after having charged to appellee a number of items for which he was not liable. Appellant contends that it became the owner of the business on the last mentioned date by virtue of a notice of cancellation given to Culley on September 22, 1947, as follows:

"Notice of Cancellation of Franchise.

"At the time of discovery of the serious shortage I thought there still may be a chance to overcome the mismanagement in your office but the more I dig in the more I find that it is impossible.

"With this in mind, and with much regret, we find it necessary to cancel your franchise, and this is notice that under Section 6, of franchise dated November 23rd, 1945, you are hereby notified that franchise is terminated as of December 31st 1947.

"Your attention is also directed to Section 8 of the franchise wherein you become liable to us for losses which we shall be forced to pay off to the lender in your behalf, and this will be a rather stiff sum as you already well know.

"Notwithstanding the unfortunate outcome of the franchise, it is my sincere hope that you may become readjusted and find yourself and bring about a clearance of all your troubles.

"I remain,

"Your friend,

"(s) Wyatt Robinson, President."

It will be observed that this notice of cancellation is based upon Culley's shortage which was fully known to appellant on July 31, 1947. Unquestionably appellant had a clear right to cancel the franchise contract when it discovered this shortage on July 31, 1947,

but after such discovery it waived its right to cancellation by its agreement with and letter to Culley on that date whereby it agreed to take over the business and operate it for Culley's benefit. When appellant assumed this obligation the business began making a net profit of approximately $225 per month according to its own admissions, and yet in less than two months appellant sought to exercise the right to cancel as originally granted in paragraph VI of the franchise contract, which had been amended or modified by the subsequent agreement of July 31. We do not hold that appellant could never thereafter cancel the contract, but we are of the opinion that appellee was at least entitled to a fair chance and a reasonable time under the new working agreement with appellant in which to have the question determined whether the business could within a reasonable time pay off the obligations which the new agreement contemplated should be discharged. In 17 C. J. S., Contracts, Section 409, pp. 897-898, it is said: ██ █ "Provisions for forfeiture may be waived by the person entitled to enforce them, either expressly or by implication, and the courts as a rule are quick to take advantage of circumstances indicating such an intention, although a waiver cannot be inferred from mere silence. Any inconsistent acts or dealings will be regarded as a waiver, but it has been held also that the intent to waive the forfeiture must be clear and unequivocal. ██ █ Knowledge of the ground for forfeiture is of course essential to the waiver. A waiver once made cannot be recalled. Hence, after a party has acquiesced in a breach of the contract, he cannot thereafter urge a forfeiture because of such breach, unless he has given reasonable notice of an intention thereafter to enforce the contract according to its terms. A statement of a specific ground for forfeiture waives other breaches."

██ █ Appellant contended at the trial that there were other good causes for cancellation which did not come to its notice until after July 31, but there was a

disputed question of fact as to these matters which the chancellor decided in appellee's favor by holding that in fact the appellant did waive its right to cancellation and did not become the owner of the business on and after December 31, 1947. We think that his finding is supported by the record and consequently it will not be disturbed.

Appellant also contends that both the franchise contract of November 23, 1945, and the supplemental agreement of July 31, 1947, were terminable at will because neither instrument fixed its duration. We do not agree with that contention for the reason that the agreement of July 31 obligated appellant to operate the business for Culley until his indebtedness to Louisiana Discount Corporation and to appellant was fully discharged out of its net profits. If under appellant's operation it had been impossible to make a sufficient profit to discharge appellee's debts within a reasonable time, appellant would not have been compelled to continue its operation indefinitely, but the fact is, as fully and conclusively shown by the record, that appellant did continue the operation, without interruption, on and after January 1, 1948, until March 1950, and during that time the business not only paid off every penny of Culley's obligations, but showed an additional profit to which he was entitled under the decree herein. Moreover, under paragraph VII of the original franchise contract in the event of cancellation appellee was entitled to a refund of what he had paid on the contract after his obligations and liabilities had been satisfied. These were in fact fully discharged long prior to the trial of this case, and appellant did not return or offer to return to appellee any portion of the purchase price of the contract. 17 C. J. S., Contracts, Sections 438 and 439.

Menger absconded on February 23, 1950, with a shortage of approximately $9,000, consisting largely of supposed loans made by him which he had actually fabricated and on which he had obtained and converted the

proceeds. Appellant contends that the trial court erred in failing to charge this shortage to appellee. The testimony in this case was taken on three different occasions. On the first hearing, prior to discovery of his defalcation, Menger as a witness for appellant testified:

"Q. Mr. Menger, from and after August 1, 1947, you were the manager, and acting for the Tower Underwriters, Inc., in this transaction, were you not? A. Yes, from August 6, or shortly thereafter." At the second hearing, shortly after Menger's disappearance, Mr. Robinson, appellant's president, testified that he found a note from Menger, confessing his shortage, and:

"Q. Now, at the time you received that you realized that the defendant in this case was responsible for the acts of Mr. Menger to the complainant in this case, didn't you? A. Yes." On the third hearing when the Master's report was up for consideration by the court, Mr. Robinson testified:

"Q. Now, Mr. Robinson, you recognized your duty to account to Mr. Culley for the operation of this business, did you not? A. Yes.

"Q. Because you rendered him an account? A. Yes.

"Q. Now in that account you fixed all salaries and allowances, didn't you? A. Yes.

"Q. Mr. Culley didn't have anything to do with that? A. No.

"Q. And you selected Mr. Menger to operate it as your agent? A. Correct." Under the quoted testimony we are of the opinion that the action of the chancellor in declining to charge appellee with Menger's shortage was correct. Leaving that shortage out of consideration, the business had paid off all of Culley's obligations of every nature and in addition had netted a substantial profit.

Appellant also contends that the trial court erred in declining to charge to appellee certain accounts which were more than ninety days past due on March 13, 1950. Appellee had guaranteed payment of all loans

made by the agency, as heretofore pointed out. The notes evidencing these loans were payable at the office of the Tower Loan Brokers in Greenville, but appellant, after the appointment of a receiver by the court on March 14, 1950, moved to another location, carrying with it all records of loans, and opened business under the name of Dollar Brokers, and published a notice in the Greenville newspaper announcing that it was no longer a guarantor or endorser for any loan business handled by Tower Loan Brokers of Greenville, and cautioning all prior borrowers that any previous loans "brokered" by Tower Loan Brokers shall be payable at the office of Dollar Brokers, and that any payments made to parties other than Dollar Brokers shall be made at the risk of the borrower. Thereby the appellant changed the place of payment on these outstanding unpaid loans and made it virtually impossible for the appellee or the receiver acting under appointment of the court to collect on any of them. When appellant thus materially altered the obligations by changing the place of payment, without appellee's consent, he was relieved of his obligation of payment as a guarantor thereof, and the chancellor was correct in declining to charge any of the delinquent accounts to him. In 24 Am. Jur. p. 927, Guaranty, Sec. 80, it is said: ██ █ "The guarantor is released or discharged of liability if, without his consent, the contract of obligation by which the principal debtor is bound to the creditor or obligee has been materially altered in respect of its terms or the manner of execution thereof." In Simmons v. Atkinson & Lampton Co., 69 Miss. 862, 12 So. 263, 23 L. R. A. 599, it was held that a change in place of payment is a material alteration. Section 166, Code of 1942, provides "Any alteration which changes

. . . .
"(3) the time or place of payment . . . Or which adds a place of payment where no place of payment is specified, or any other change or addition which alters the effect of the instrument in any respect, is a material

alteration.'' In 2 Am. Jur. p. 621, Alteration of Instruments, Sec. 33, it is said: ''The law carefully guards the rights of a surety on an instrument whether the relation of the principal is shown by his being a surety in the technical sense of the term, indorser, or otherwise. Any material alteration in the instrument fixing the liability of the surety, if without his consent, such as an alteration in the date, the amount, or the time or place of payment, will discharge him although made without the knowledge of the person for whose benefit the suretyship obligation was taken.'' See also 39 Am. Jur., Novation, Secs. 24 and 27. We conclude that there is no merit in appellant's contention with respect to this point.

The remaining assignments of error deal with the chancellor's actions and findings on the hearing of objections and exceptions to the Master's report. They involve no questions of law which require discussion and all deal primarily with findings of fact. Each finding in question is amply supported by the evidence and the final decree is accordingly affirmed.

Affirmed.